**SO ORDERED.**

**SIGNED this 15 day of July, 2008.**



_____
JANICE MILLER KARLIN
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

In re:                                              )
                                                    )
**RAFTER SEVEN RANCHES, LP,**          )          **Case No. 05-40483**
                                                    )          **Chapter 12**
                                    Debtor.          )
_____ )

## MEMORANDUM OPINION AND ORDER

This case represents yet another chapter in the contentious relationship that has

existed between WNL Investments, L.L.C. and Debtor, Rafter Seven, LP, since at least

2004.  The dispute has already made its way to the Bankruptcy Appellate Panel of the

Tenth Circuit Court of Appeals and back,[1] and it now requires interpretation of yet

another provision of the Settlement Agreement the parties negotiated on January 10,

2006.

_____

[1] *In re Rafter Seven Ranches LP,* 378 B.R. 418 (Table) (10th Cir. BAP 2007) (interpreting that part of Settlement Agreement establishing how tracts would be sold).

Although Debtor has couched the issue in this case as arising from a violation of the automatic stay, the dispute, at its core, depends on whether the consensual agreement between the parties, as manifested in the Court's order approving that agreement dated February 27, 2006,[2] retained for Debtor the right to receive, in perpetuity, all gross farm income that would ever be generated on the subject real estate.

Debtor now claims that it is entitled to receive all gross farm income derived from Tract 3 from January 11, 2006 until that land is re-sold and title vests in a new owner. That claim is predicated on one sentence in the ten-page agreed order. That sentence, which Debtor, through its main partner Michael Friesen, says was the drafting "artistry" of WNL's counsel,[3] provides: "5(e). All farm income generated from the Real Estate [previously defined as encompassing three tracts, to include Tract 3] from and after January 11, 2006 shall be and is the sole and exclusive property of the debtor."[4]

This matter is presently before the Court on a Motion for Summary Judgment filed by Debtor Rafter Seven Ranches LP ("Debtor" or "Rafter Seven"),[5] a Motion for Summary Judgment filed by Creditor WNL Investments, LLC ("WNL"),[6] and a Motion for Summary Judgment filed by Duane Koster ("Koster").[7] Each of these summary

---

[2]Doc. 177.

[3]Friesen deposition, page 23.

[4]Doc. 177, page 7.

[5]Doc. 390.

[6]Doc. 392.

[7]Doc. 394.

2

judgment motions seeks to resolve Debtor's Motion for Actual Damages, Attorney Fees, Costs and Punitive Damages Against Respondents for Violation of the Automatic Stay.[8] Debtor claims that WNL and Koster violated the automatic stay when Koster sold the 2007 wheat crop on Tract 3 and failed to thereafter immediately turn over the gross receipts from that sale to Rafter Seven.[9]

In addition to the evidence contained in the three summary judgment motions, the Court also conducted an evidentiary hearing on July 9, 2008 on two very limited issues about which there appeared to be a genuine issue of material fact.[10] The parties have fully briefed their motions, the Court has heard and weighed the evidence presented at that

---

[8] Doc. 331. This motion was later amended by Docs. 346 and 347. If Debtor's summary judgment motion was granted, it would not resolve all issues, because the Court expressly reserved the issue of attorney fees, costs, and punitive damages until and if Debtor prevailed on its underlying request for a finding that WNL and Koster had, in fact, violated the automatic stay. *See* Pretrial Order, Doc. 388.

[9] At the Pretrial Conference, Debtor tried to add new claims alleging violation of the stay for the proceeds of the 2008 wheat crop, which crops, as of the date of the Pretrial Conference, had been planted for at least 4 months, and during the entire time the parties were engaged in discovery pursuant to this Court's Scheduling Order. The Court denied the late amendment, without prejudice to Debtor seeking those proceeds at a later date if it prevails on its theory on the 2007 wheat crop. The Court also notes that Debtor has now apparently shifted from his theory of recovery asserted in the final Pretrial Order, that the stay violation occurred "by planting a wheat crop . . . , by harvesting that crop, and by selling the crop and retaining the funds . . ." to now claiming the only stay violation was when Koster failed to turn over the gross proceeds received after the crop was harvested in July 2007. Regardless which of these theories he uses, it does not change the outcome of this proceeding.

[10] *See* Doc. 417, Notice of Evidentiary Hearing. The Court determined, after a review of the parties' summary judgment motions, that there was a possible genuine issue of material fact regarding the noted sentence in the parties' Settlement Agreement. The Court further found that less time would be consumed by hearing testimony and receiving evidence on the meaning of ¶ 5(e) of the parties' agreement than by proceeding to decide the summary judgment motions without that evidence. The Court also sought evidence on whether there was any net income received from the 2007 crop, in light of the condition of the land when Koster began farming it, and the expenses incurred in obtaining the ultimate crop proceeds. No party objected to this procedure.

3

evidentiary hearing, and the Court is now ready to rule.  This is a core proceeding,[11] and this Court has jurisdiction to hear this contested matter.[12]

## I.  FINDINGS OF FACT

Debtor Rafter Seven is a partnership in which Michael Friesen owns a 98% interest, and his two adult children each own a 1% interest.  Friesen is the general partner.  In October 2002, WNL purchased three one-quarter section tracts of real property ("the Real Estate") that were at that point involved in tax foreclosure proceedings because the owners had failed to pay assessed real property taxes.  WNL purchased one quarter from Debtor and the other two from trusts controlled by Michael Friesen.  According to the parties' agreement, WNL was required to lease back all three tracts to Debtor and the Trusts ("Sellers"), and Sellers had an option to repurchase.

Sellers failed to make any of the required lease payments, even after WNL extended the time to pay on the condition that Sellers would relinquish all interest in the property if they did not pay by the extended date.  When Sellers did not make payments after the extension, WNL issued a  notice of default.  Instead of complying with their commitment to relinquish their interest in the property, Sellers filed Declarations of Equitable interest with the Finney County, Kansas Register of Deeds in March 2004, which served to cloud WNL's title.  WNL then sued Sellers in state court for quiet title, ejectment and money damages.

---

[11]28 U.S.C. § 157(b)(2).

[12]28 U.S.C. § 1334.

4

The central dispute in state court was whether Debtor had an equitable mortgage on the Real Estate, or whether the contract for sale should be enforced as written (which called for forfeiture of all interest).[13] The Trusts subsequently abandoned their claim of interest in the Real Estate,[14] and Debtor filed a Chapter 12 bankruptcy petition in March 2005, claiming the only interest in all the Real Estate.

Soon after Debtor filed for relief, in April 2005, WNL filed a Motion for Relief from Stay,[15] to which Debtor objected. In May 2005, Debtor filed a motion to assume leases,[16] and WNL objected. Debtor filed a plan in August 2005,[17] to which WNL also objected. Debtor then objected to WNL's Proof of Claim,[18] and WNL responded to that objection. These disputes were all set for a January 2006 evidentiary hearing before Judge Somers, who was previously assigned this case.

Before any evidence was received, the parties started talking settlement, and ultimately announced to the Court that an oral agreement had been reached in principle on

---

[13] *See* Pretrial Order, Doc. 127.

[14] Although the Trusts expressly relinquished whatever interest they had in the subject real estate, as noted in § 4(i) of the Court's Order, which fact was acknowledged when Mike Friesen approved the Settlement Agreement in his capacity as the Trusts' representative, Mike Friesen nevertheless gave the money received from the 2006 wheat crop, pursuant to the terms of the Settlement Agreement, to the Trusts, and failed to report that income to the Chapter 12 Trustee. When WNL and Koster's counsel caught him doing this, he stated (during his deposition) that if "it's going to become a big deal" he'd return the money to the estate, where this Court finds it rightfully belongs. *See* Exhibit 2 to Koster's Memorandum in Support of Summary Judgment, at page 75 of deposition (page 19 of Exhibit 2). The Court assumes Mike Friesen will now promptly return that money to the Chapter 12 estate because consciously diverting property of the estate to someone not entitled to it is a "big deal."

[15] Doc. 26.

[16] Doc. 30.

[17] Doc. 71.

[18] Doc. 79.

5

all issues. Debtor and WNL then filed a joint motion for approval of a stipulated and agreed order approving the Settlement Agreement.[19] The Court approved the order, and it was entered February 27, 2006,[20] after at least one hearing and much negotiation about the actual language to be included in the agreement and order. Although WNL's counsel took the lead in shepherding the agreement through the drafting process, both parties' counsel were involved in suggesting and editing the language of the agreement. Judge Somers also noted, after hearing evidence regarding the drafting process, that "[t]he Court is convinced that Friesen on behalf of the debtor, and the debtor's lawyer to a lesser extent, had input into the terms of the Agreement."[21] In addition, Friesen, who himself has a law degree, participated in drafting and editing some of the language in the agreement.

The main purpose of the agreed order was to allow Debtor time to obtain a loan or otherwise raise the funds to pay the debt owed to WNL, which the parties agreed to set at $240,000. Although during the negotiation process, Friesen thought he could acquire the funds within 60 days, WNL's principal was dubious, and offered to give Debtor a full six months, until July 15, 2006, to come up with the money. WNL made it patently clear during negotiations with Friesen, and prior to the execution of the agreement, that its primary motivation was to permanently terminate any relationship it had with Debtor or Friesen

---

[19]Doc. 165.

[20]Doc. 177.

[21]Doc. 250, Journal Entry of Order Denying Debtor's Motion to Interpret the Agreement Between WNL and the Debtor.

6

because of their history of not keeping their promises, and extending disputes by negotiating for additional time to perform obligations.

The agreement ultimately decreed that WNL was the absolute owner of all legal and equitable interest in the subject real property, but the property would nevertheless be sold at auction if Debtor did not pay the agreed sum on or before July 15, 2006. The agreement also capped the amount that WNL would receive from the auction sale of the tracts, and provided the methodology for the sale of the property. The agreement did not provide for WNL to receive interest on the $240,000, and thus it had a financial incentive to expeditiously conclude the sales in the event Debtor did not timely pay the cash settlement price.

Debtor failed to exercise its right to purchase, and the first of three tracts was sold at auction in September 2006 for $113,600; that sale closed without incident. WNL then scheduled and advertised the sale of the remaining two tracts for October 31, 2006. The order required the tracts be sold separately, or "one quarter ... at a time," because WNL was authorized to only sell as much property as was required to pay the agreed amount. So if WNL received $240,000 after the sale of the first two tracts, the third would not be sold at all, and title would go to Debtor free and clear of any interest by WNL.

Debtor believed that the Settlement Agreement did not allow WNL to sell Tracts 2 and 3 consecutively on the same date. It therefore filed a motion shortly after it learned that Tracts 2 and 3 had been advertised to be sold consecutively. In that motion, it requested the Court order the sales to be held on separate days.

7

An evidentiary hearing was conducted on the motion to interpret the agreed order six days before the advertised sale. In construing the parties' agreement and the Court's order, the judge held that the agreement did not require the remaining two tracts to be sold on separate days. He orally denied Debtor's motion on the record that day. Counsel for WNL was ordered to prepare an agreed order memorializing the Court's oral ruling. Counsel opted to submit the order to the Court pursuant to D. Kan. LBR 9074.1, which gave all interested parties 10 days to object to the order proposed by WNL. Debtor filed no objection to the order served pursuant to that local rule, and the written order memorializing the Court's oral ruling was finally entered November 14, 2006—two weeks after the auction of Tracts 2 and 3.

Debtor did not seek a stay of the sale of Tracts 2 and 3, and Koster was the high bidder on Tract 2 for $94,400. Coupled with the net proceeds from the sale of Tract 1, Rafter Seven thus still owed approximately $40,000 on the agreed $240,000 sum. So Tract 3 was then auctioned, and Koster also made the high bid for that tract (at $74,740). He paid $5,000 earnest money on the date of the sale. That money has never been returned to him, and that sale has never closed for reasons discussed below.

On November 22, 2006, nearly a month after Koster had purchased Tract 3 and after he had completed planting a crop on that land—a fact Rafter Seven's principal, Friesen, well knew,[22] Debtor filed a Motion to Reconsider the Court's oral ruling of October 25, 2006 that authorized the consecutive sale of Tracts 2 and 3 on the same day. That motion was timely

---

[22]Koster Affidavit, Paragraph 29.

filed because of the considerable delay in getting the order entered on that matter. Debtor's motion for reconsideration was denied December 22, 2006. Judge Somers again held that the sale of Tract 3 immediately after the sale of Tract 2, and on the same date, was in accordance with the parties' Settlement Agreement and his order.[23]

Debtor appealed that decision to the Bankruptcy Appellate Panel for the Tenth Circuit Court of Appeals. On September 12, 2007, the BAP reversed the decision, finding that the sales of Tracts 2 and 3 should have been held at least one day apart.[24] WNL has not since rescheduled the sale of Tract 3 because of this litigation,[25] but more importantly, because Friesen, on behalf of Debtor, filed a "Notice of Suit Re: SE/4 25-22-31" with the Register of Deeds of Finney County, Kansas on October 29, 2007.[26] WNL claims that notice has clouded the title to Tract 3,[27] and has resulted in the sale being delayed. This is significant in light of the fact that the parties manifested an intent to terminate their relationship, and effectuate the Settlement Agreement, no later than July 15, 2006—exactly two years ago today.

---

[23]Docs. 255-56.

[24]*In re Rafter Seven Ranches LP*, 378 B.R. 418 (Table) (10th Cir. BAP 2007).

[25]Debtor has asserted he wishes to use the expected recovery of actual and punitive damages from this suit to fund the purchase of Tract 3, and to then farm Tract 3 to fund a plan.

[26]Friesen admits he filed this Notice on behalf of Debtor. *See* Doc. 414,¶ 7.

[27]Doc. 411. WNL has, in fact, recently filed a Motion to Enforce Settlement Agreement, Doc. 411, alleging that this Notice, which Friesen admitted he prepared and filed with the Finney County Register of Deeds, serves to effectively bar the sale of Tract 3 because it created a cloud on the title. The Court also today grants that motion.

At the time the parties negotiated the agreement and also on the date of the auction, Tract 3 was in very poor farming condition because it was badly overgrown with bind weed, Johnson grass and kochia—in some places as high as shoulder height. The weed overgrowth negatively impacted its value, as did the fact that it contained an old homestead that was essentially used as a junk yard. Immediately following the sale of Tracts 2 and 3, Koster—the high bidder of both tracts— requested permission from WNL to commence farming operations on each tract. The reason for this early request was because (1) WNL was the undisputed owner of all legal and equitable interest in the real estate pursuant to the Settlement Agreement, and could thus do whatever it wanted with the land, (2) both Koster and WNL anticipated the sale would close without incident just like the first tract had, and (3) despite poor prospects of obtaining a wheat crop that would exceed the expenses related to Tract 3, Koster wanted to immediately begin farming that land to bring the weeds and grasses under control so that a second growing season would not be lost.[28]

Debtor learned directly from Koster on the date of the sale, October 31, 2006, that Koster intended to immediately begin cutting weeds and planting a wheat crop, without

---

[28]In response to Koster's motion for summary judgment, Debtor attempts to controvert this statement of fact, which fact is supported by an affidavit submitted by Koster. Debtor attempts to controvert this statement solely on the basis that "[i]t is unknown as to what Mr. Koster's motivations were for the actions he took. This is speculative." The Court finds that Debtor's attempt to controvert this statement of fact in this manner, and many others in this response as well as in Rafter Seven's response to WNL's motion for summary judgment, is completely without merit. For purposes of a motion for summary judgment, Koster's affidavit is sufficient evidence of what his own motivations were in regard to the planting of the crop, and if Debtor has reason to dispute Koster's intentions, those facts should have been developed by Debtor in the discovery process, and refuted by its own affidavit, answers to interrogatories, requests for admission, or deposition testimony. Similarly, and by way of example, counsel for Rafter Seven insisted on "controverting" factual statements in WNL's motion because it did not have knowledge, one way or another. It is completely ineffective and improper to attempt to controvert a statement of fact that is supported by an affidavit on the basis that the responding party does not have personal knowledge of whether the affiant is telling the truth, and it is similarly ineffective and improper to controvert a statement on the basis of lack of knowledge, especially when, as here, the parties have completed discovery.

10

waiting for the official closing.[29]  Friesen did not tell Koster at that time, or at any time thereafter until effectively an entire year later—on October 21, 2007 when he filed the instant motion, that Rafter Seven was going to assert a claim to 100% of the income from any crop harvested from Tract 3.  Accordingly, Koster's first notice that Rafter Seven would assert this claim occurred almost a year after Southwest Agriculture ("Southwest Ag"), a partnership in which Koster holds a one-seventh partnership interest, began farming Tract 3.[30]  This notice thus came not only after Southwest Ag had expended considerable time and money cleaning up the poor condition of the land, planting the 2007 wheat crop, and harvesting that crop, but also a few weeks after it had expended considerable resources to prepare for and plant the 2008 crop.  Friesen certainly made no effort at the actual sale to notify potential bidders—including Koster—of Rafter Seven's "claim" to all future farm income on Tracts 2 and 3.

Friesen has espoused various theories on when the stay violation first occurred.  He testified at his deposition that he first formed the opinion that Rafter Seven could assert some interest in the crop planted on Tract 3 shortly after he realized that someone had planted wheat in November 2006—within a month of the sale.[31]  Conversely, he also testified during his deposition and during the evidentiary hearing that he knew when the sentence (¶ 5(3))

---

[29]*See* Friesen deposition, pages 26-27 and Friesen declaration.

[30]Conspicuously absent in the Pretrial Order that governs this matter is any claim by Debtor against the entity, Southwest Ag.  It only claims a stay violation against WNL and Koster, individually.  The uncontroverted evidence, however, is that Koster did not individually farm Tract 3, nor did he receive all of the net proceeds from the harvested crop thereon.  Instead, the evidence is that Southwest Ag did the farming and harvesting, and that Koster only received or became entitled to receive $380, representing his 1/7th share of the net proceeds from the harvest.

[31]*Id.* at 91-92 (Friesen testifying that first date stay violation occurred was November 3, 2006).

11

was included in the Settlement Agreement in early 2006 that Rafter Seven would be entitled to gross income (until a new owner had taken title after the closing of the sale of Tract 3). He never really claims, with a straight face, that he actually intended to negotiate for that result. Instead, it is more the fortuity of drafting that has resulted in this claim.

In his deposition, he testified

> [t]he subject provision was a "quid pro quo" provision that related to assets known by WNL and the debtor to exist as of January 2006, namely rent for the crops **to be harvested in 2006** from the three tracts of real estate, and the funds being held in the Finney County Registry. Regarding the 2006 crops, wheat was eventually harvested from only one of the three tracts (it was a bad crop year) that generated a one-third interest to which the debtor was entitled of approximately $1,800."[32]

In addition, he admitted that although he elected not to disclose this possibility to WNL's representatives when the agreement was being negotiated, the other possibility for recovery he had in mind when he was negotiating the settlement was the possible income from potential disaster payments from prior crop years, 2004 or 2005,[33] not income to be generated off the land thereafter.

Whenever Friesen actually first thought he could use this language to make a claim, he elected to keep this newly-formed opinion to himself, notwithstanding that he fully understood that Koster (a man he had gone to high school with and had known 45-50 years) was incurring and would continue to incur considerable additional expense with respect to

---

[32]Paragraph 42 of WNL's undisputed facts in its summary judgment motion, to which Debtor responded "Uncontroverted." (Emphasis added)

[33]*Id.* at pages 59-60.

that wheat crop,[34] and ultimately even a future wheat crop on Tract 3. He deliberately stood silent and allowed Southwest Ag to incur those expenses.[35] He did not come to this Court asking for an interpretation of the Settlement Agreement that he now contends "unambiguously" provided him the farm income at least until the sale of Tract 3 closed, although he is critical of WNL and Koster for failing to do the same, when they had no idea that Rafter Seven/Friesen had formed this secret opinion about the farm income from Tract 3.

Friesen also failed to mention or make any demand for this farm income when he sent a letter to Koster dated November 1, 2006 (trying to still make a deal to buy or trade with Koster for Tract 3),[36] or when Debtor filed a Motion to Reconsider on November 22, 2006, or when Debtor filed a request for a hearing on December 5, 2006, or when it filed its Reply to the Response to Debtor's Motion to Reconsider on December 18, 2006, or on May 27, 2007 when it responded to the Trustee's Motion to Dismiss (at which time Debtor could and should have informed the Trustee of this new "asset"). Debtor also failed to mention this

---

[34]*Id.* at page 52-55.

[35]When Friesen was asked in his deposition if, when he watched persons harvesting wheat off of Tract 3 in early July 2007, he thought he was "witnessing a bankruptcy stay violation," his answer was "I knew I was." *Id.* at 120. Notwithstanding that firm knowledge, he allowed Southwest Ag to continue to incur all the costs of that harvest, AND allowed Southwest Ag to put another crop in the ground before finally coming forward. (Hanson affidavit ¶ 15) Notwithstanding that conduct, Friesen/Rafter Seven nevertheless seek this court's equity in granting Rafter Seven (and thus Friesen himself to the extent of his 98% interest in the partnership) 100% of the gross proceeds from that crop. *See* Friesen deposition at 118.

[36]*See* WNL Exhibit E. This letter is also interesting because Friesen offers to reimburse Koster for his input costs if he had completed planting, which tends to show that the normal course of business in this industry is to negotiate for net income, not gross.

13

claim at any time during the briefing before the BAP or at oral argument on July 17, 2007.[37] The first mention of this theory occurred when it filed its Motion for Damages that is the subject of these summary judgment motions, on October 21, 2007.

The BAP decision effectively setting aside the sale of Tract 3 was issued on September 12, 2007. Friesen even elected to wait six additional weeks after that decision was entered—even though he claims he had known since November 2006 that he was going to assert this claim on Rafter Seven's behalf—to first notify Koster and WNL of this claim. It does not appear to be a coincidence that Friesen elected to wait until Southwest Ag had incurred significant additional input costs for the 2008 crop year before first asserting this claim. And it cannot be forgotten that Rafter Seven is asking for gross income off this land—so Friesen allowed his old high school acquaintance, Koster (through Southwest Ag), to spend money on seed, fertilizer, machinery and fuel knowing full well that Southwest Ag would lose all of that PLUS any profit on the land if Rafter Seven prevailed on the theory its general partner had formed almost a year earlier.

Southwest Ag's preparations for planting, post-planting activities and harvest of the Tract 3 wheat crop, which occurred in July, 2007, were all done openly and with no attempt to disguise what was going on or who was doing it. Friesen engaged in numerous activities to ascertain who was actually farming on Tract 3, such as questioning a neighboring farmer, checking with the co-op, etc., but he never questioned Koster, himself, even though he had

---

[37]And July 17, 2007 would have been immediately after the 2007 wheat had been harvested, when one would presume the claim to the wheat would have been fresh in Friesen's mind.

had a "moderately good relationship with Koster" for 45 years,[38] and knew Koster had sought and received permission from WNL's principals to plant a crop. Had he discussed his claim with Koster, Koster might have been given some warning, in time to protect himself from the claims now being made, that Friesen/Rafter Seven was going to claim some interest in the crop.

Again, Debtor sometimes asserts that the alleged stay violation began on or about November 3, 2006, when Koster began farming Tract 3, and culminated when the wheat was sold and the total amount received was not turned over to Rafter Seven on July 5, 2007, and sometimes it claims that the violation of the stay first occurred when Koster failed to turn over the gross proceeds to it after the harvest in July 2007. Regardless whether Friesen chooses the November 2006 date or the July 2007 date for when he alleges the stay violation occurred, it is undisputed that the first time Debtor made any claim to the wheat or its proceeds, or told WNL or Koster that they had allegedly violated the stay, occurred October 21, 2007 (a Sunday) at 9:42 p.m., the date and time the instant motion for damages was electronically filed with this Court.[39] Debtor never told Koster, WNL or anyone else

---

[38]When Friesen testified on October 25, 2006, he said "I've known Duane [Koster] for forty-five, fifty years . . . ." Doc. 274, Page 16. Just prior to the hearing held October 25, 2006, Friesen (on behalf of two trusts) and Koster had made some attempts to mutually negotiate a "private treaty" sale (Doc. 274, page 32), and the day after the sale, Friesen again approached Koster about making a trade of land.

[39]Doc. 332. The Court takes judicial notice of the date and time, which it can access through its CM/ECF docket entries. Debtor elected to file this pleading less than 12 hours before a hearing scheduled for the next morning, October 22, 2007 at 9 a.m. Over five weeks earlier, on September 14, 2007, Judge Somers had issued a notice of a Status Conference (Doc. 313) to be held October 22, 2007 to consider the impact of the BAP's September 12, 2007 opinion. That notice specifically said "Counsel for the respective parties are expected to have met or spoken about the pending matter before the status conference so that any issues that can be resolved prior to the Status Conference are so resolved, and so any remaining issues needing resolution by the Court can be easily outlined to the Court at the status conference." Notwithstanding that mandate for counsel to speak prior to October 22, 2007, Friesen/Rafter Seven never opted to disclose this "claim" until that Sunday night filing.

15

associated with those parties, about having any claim to the crop until the filing of the motion for damages, nor did it make any written claim or demand before then.[40]

Until November 22, 2006, when Rafter Seven filed its motion for reconsideration of the Court's ruling regarding consecutive sales on the same date—_after_ Southwest Ag incurred most of the expense of planting the 2007 wheat crop, neither Friesen, nor anyone else on Debtor's behalf or anyone else, gave Koster any reason to believe that Debtor would challenge the sale of Tract 3, let alone that Friesen or Debtor would later lay claim to the entire gross proceeds from any crop.[41] By the time that motion for reconsideration was filed, the planting of the 2007 wheat crop had been completed. The wheat crop was harvested in early July 2007, and the BAP did not issue its decision, which effectively invalidated the sale of Tract 3, until September 12, 2007.

Additional facts will be discussed below, when necessary.

## II. ANALYSIS

Debtor initiated this contested matter seeking actual damages, punitive damages and attorney fees for an alleged violation of the automatic stay. The automatic bankruptcy stay is one of the fundamental debtor protections provided by the bankruptcy laws.[42] It gives the

---

[40]Friesen argues he has no obligation to make an oral or written claim, as ¶ 5(e) of the agreement "unambiguously" provided all the notice of this claim to which anyone was entitled.

[41]Debtor attempts to controvert this statement by indicating that it followed all applicable rules for filing a motion to reconsider and the appeal, and that Judge Somers was subsequently reversed by the BAP regarding the sale date of Tract 3. Although Debtor's statement is true, it does not alter the stated fact that no one gave Koster any reason to believe that Debtor, or anyone else, intended to challenge the sale of Tract 3 prior to the filing of the motion for reconsideration, and thus prior to the time Southwest Ag incurred considerable expense. Again, Debtor's attempt to controvert this statement with a recitation of its timely filing of the motion to reconsider does not serve to controvert the stated fact.

[42]_Fortier v. Dona Anna Plaza Partners_, 747 F.2d 1324, 1330 (10th Cir. 1984).

16

debtor a breathing spell from its creditors, and it stops all collection efforts, all harassment, and all foreclosure actions. The stay permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove it into bankruptcy. [43]

According to Debtor, the agreed order entered by Judge Somers in February 2006 granted Debtor the right to all farm income from Tract 3, without deduction of any expenses attributable to obtaining that income, until all the Real Estate subject to the order was sold and the sales were closed. Because the sale on Tract 3 has never closed as a result of the BAP appeal, the Notice of Suit Friesen filed, and the pendency of this motion, Debtor contends that the failure of Koster, who is a 1/7 partner in the partnership that planted wheat on Tract 3, to turn over the gross income from the wheat crop, and the granting of permission by WNL to Koster to plant the crop on Tract 3, violate its stay rights under 11 U.S.C. § 362.[44] Alternatively, Debtor contends those acts or omissions should constitute contempt of court punishable under § 105.

As a remedy, it seeks an order requiring Koster to not only turn over 100% of the income from the wheat crop that was planted by Southwest Ag in November 2006 and

---

[43]*Id.*

[44]This case was filed before October 17, 2005, when most provisions of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 became effective. All statutory references to the Bankruptcy Code are thus to 11 U.S.C.A. §§ 101 - 1330 (2004), unless otherwise specified. All references to the Federal Rules of Bankruptcy Procedure are to Fed. R. Bankr. P. (2004), unless otherwise specified.

17

harvested in July 2007—as an asset of the estate,[45] but also seeks the attendant damages, actual, punitive, attorney fees, costs, etc., from a stay violation or contempt of court. Conversely, WNL and Koster argue that Debtor is taking one sentence of the agreed order out of context, and that when the entire order is read as a whole, it is clear that Debtor never had any right to the income generated by the crop planted and harvested by Southwest Ag. WNL and Koster argue that, notwithstanding the seemingly simple sentence saying "all farm income" generated after January 11, 2006 is forever Debtor's, that sentence cannot be read in a vacuum, and when read in context with the rest of the agreement, demonstrates that the parties did not mutually agree to an in-perpetuity interest by Debtor in all future farm income on Tract 3.

## A. Neither WNL nor Koster violated the automatic stay.

The Court's first task is to interpret the provisions of the Settlement Agreement. As the Bankruptcy Appellate Panel noted in its earlier decision interpreting a different portion of this same agreement,[46] Kansas law governs its interpretation. Whether a contract is ambiguous is a matter of law to be decided by the Court.[47] The BAP has provided the Court with the appropriate standards to use in interpreting this very agreement:

---

[45]Debtor requests the Court award it damages based upon the total amount of wheat harvested, multiplied by the underline current market value of that wheat—without deduction for the expenses incurred in preparing the land, or planting, harvesting or transporting the crop. In fact, Debtor actually wants not what Southwest Ag sold the wheat for (approximately $5/bushel) back in July 2007, but what that wheat would sell for now, which the Court understands is considerably more.

[46]*In re Rafter Seven Ranches LP*, 378 B.R. 418 (Table) (10th Cir. BAP 2007).

[47]*Simon v. Nat'l Farmers Org., Inc.*, 250 Kan. 676, 678 (1992).

Case 05-40483   Doc# 430   Filed 07/15/08   Page 18 of 39

An unambiguous contract must be interpreted "solely within its four corners, and extrinsic evidence is inadmissible." *Youell v. Grimes*, 217 F. Supp. 2d 1167, 1173 (D. Kan. 2002) (quoting *Clark v. Wallace County Coop. Equity Exch.*, 26 Kan. App. 2d 463, 986 P.2d 391, 393 (1999)). A contract term is ambiguous only where "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *McGinley v. Franklin Sports, Inc.*, 75 F. Supp. 2d 1218, 1234 (D. Kan. 1999), aff'd, 262 F.3d 1339 (Fed. Cir. 2001) (citing *Marquis v. State Farm Fire and Cas. Co.*, 265 Kan. 317, 961 P.2d 1213, 1219 (Kan. 1998)). In determining if ambiguity exists, "[t]he court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists." *McGinley*, 75 F. Supp. 2d at 1234.

This rule of construction correlates with the so called "cardinal rule" of contract interpretation that a court must "ascertain the parties' intention and give effect to that intention when legal principles so allow." *Williamson v. Kay (In re Villa West Assocs.*), 146 F.3d 798, 803 (10th Cir. 1998) (citing *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan. App. 2d 30, 926 P.2d 669, 674 (1996)). "Reasonable rather than unreasonable interpretations of contracts are favored, and accordingly, interpretations which lead to absurdity or negate the purpose of the contract should be avoided." *Time Warner Entm't Co., LP v. Everest Midwest Licensee, L.L.C.*, 381 F.3d 1039, 1044-45 (10th Cir. 2004) (internal quotation marks omitted). All terms of a contract should be read together in harmony. *Id.* at 1045 (internal quotation marks omitted). Where faced with a choice of finding a contract term meaningless or meaningful, a court will opt for the latter. *Stark v. Resolution Trust Corp.*, 856 F. Supp. 1509, 1513 (D. Kan.1994).[48]

In light of these standards of review, this Court finds that this contract, at least as it

relates to the single sentence contained in paragraph 5(e), is ambiguous when read in concert

with the other ten pages of the contract. Admittedly, if the Court read the sentence in

isolation, without reference to the other portions of the contract, and also threw common

sense out the window, it might be able to believe that the parties intended for Rafter Seven

---

[48]*Id.* at *3. *See also Wood v. Hatcher*, 199 Kan. 238, 242 (1967) (noting that the language in a contract "is ambiguous when the words used to express the meaning and intention of the parties are insufficient in a sense the contract may be understood to reach two or more possible meanings. . . .").

to receive all the gross income generated from farming Tracts 1, 2, and 3 from January 11, 2006 until the end of time. That would be the literal translation of that one sentence. But even Mike Friesen admits that is not what he thinks this sentence really means.

Instead, he contends this sentence really means the following:

1. That as to Tracts 1 and 2, Rafter Seven is entitled to all net income (profit) on any crop that was in the ground ("2006 crop") from January 11, 2006 until the sale on that particular ground was closed;

2. That as to Tract 3, Rafter Seven is entitled to the net income (profit) on the 2006 crop that was in the ground on January 11, 2006; but

3. For any crop planted and harvested on Tract 3 after the 2006 crop was harvested, this sentence entitles Rafter Seven to all gross income until the sale of Tract 3 is closed.

Mr. Friesen's own complicated interpretation of this sentence, skewed to best fit the facts as they have subsequently developed since the agreement was actually negotiated, however, is probably the best evidence that this sentence is, in fact, ambiguous.

WNL contends that the sentence means something completely different; it contends that Debtor was entitled to receive the net income from the wheat that was growing on each of Tracts 1, 2 and 3 (the 2006 crop) at the time the agreement was negotiated in January 2006, but nothing else. The parties' interpretations could not be much further apart, the language is capable of more than one interpretation, and thus the Court must look past the

language of just this one sentence, to the entire contract, to see if the parties' intention can be ascertained from its four corners.

Several other provisions of the contract lead the Court to ultimately find that WNL's interpretation of the pertinent sentence is, in fact, representative of the parties' intent as of the date of the agreement's signing. First, the contract clearly provided that WNL was deemed to be the absolute owner of all three tracts, and that Friesen and Debtor were barred from doing anything to cause a lien or encumbrance on the real estate.[49] Second, the contract provided for Debtor to pay WNL $240,000 on or before July 15, 2006.[50] Third, the contract plainly said WNL would agree to no extensions of the July 15, 2006 payment deadline.[51] Fourth, the contract noted that time was of the essence.[52] These sentences lead the Court to believe that at the time of negotiation, the parties believed the entire settlement would be effectuated by about the time of the harvest of that 2006 wheat crop.

Furthermore, the paragraph immediately preceding the disputed sentence provides for WNL to receive the approximate $7,160 being held by the Finney County court,[53] which sum would be effectively reduced by WNL's agreement to pay the real estate taxes due for 2005 and prior years, which the parties stipulated totaled approximately $4,000, for an amount of

---

[49]Paragraph 5(a).

[50]*Id.* at ¶5(b).

[51]*Id.*

[52]*Id.* at ¶ 7.

[53]*Id.* at ¶5(d). This apparently represented net farm income and possibly government and other subsidies earned on Tracts 1, 2 and 3 during the pendency of the state court litigation.

21

net farm income going to WNL under this agreement of around $3,160. In addition, the following sentence in the agreement states as follows: " The record owner of the Real Estate at the time that the 2006 real estate taxes become due shall timely pay the 2006 and subsequent real estate taxes on the Real Estate." Since Friesen had indicated, as expressed in the Settlement Agreement, that he had every intention of buying all this real estate by July 15, 2006, and the 2006 real estate taxes would not come due until December, 2006, it appears clear that the parties intended for WNL to pay the 2005 taxes, and Rafter Seven would be responsible for the future taxes—or if Rafter Seven didn't pay the required $240,000, the high bidder at the sales that would follow soon after the July 15, 2006 deadline would be responsible for those 2006 and future taxes.[54]

All of these clauses read together lead this Court to find that the parties' mutual intent was for the terms of this Settlement Agreement to be completed prior to the date those 2006 real estate taxes would ever become due. As it turns out, the sales were all scheduled and held by October 31, 2006, and two of the tracts closed, so what occurred later also corroborates what the parties likely intended. The fact that the sale of Tract 3 did not

---

[54]We now know that WNL was the record owner at the time the 2006 real estate taxes became due in December 2006, only because it was unable to close on the sale held October 31, 2006. It has been unable to re-sell Tract 3 because of the BAP appeal and the Notice that Friesen filed two days before the sale that clouded the title. We also know that WNL has a duty to sell Tract 3 because the first two tracts did not net $240,000 pursuant to ¶ 5(c)(1). We also know that WNL does not intend to buy the property (and it didn't buy the first two tracts), and so it is more likely than not that a third party will ultimately buy Tract 3, and under normal sale procedures, would be responsible for the real estate taxes that would come due after that closing, unless otherwise agreed. If § 5(g) is read literally, however, since WNL was the record owner when the 2006 taxes became due, this sentence would require WNL to forever pay "all subsequent real estate taxes" on this property, even if it is not the ultimate buyer. Such an interpretation, however, would be equally absurd. Again, the Court cannot interpret this contract literally in some instances, because to do so would lead to an absurd result that the parties obviously did not contemplate, and which are per se unreasonable.

22

ultimately close could not reasonably have been anticipated by any party at the time the agreement was being negotiated.

Reading the disputed sentence as WNL suggests is the only way to read all the sections in harmony. Reading it as Mr. Friesen suggests is frankly absurd,[55] especially when viewed in light of his conduct regarding the subject land after the agreement was made, and before the Court finds he truly came up with this novel theory.

First, if Debtor was really entitled to gross income from any crop in the ground as of the date of the agreement until closing, as Friesen contends is the case as to Tract 3, then Debtor was also entitled to 100% of the gross proceeds from the 2006 wheat crop from Tracts 1, 2, and 3. But Friesen never demanded 100% of the proceeds when that crop was harvested. Instead, he recognized that the tenant farming that land was entitled to take his share, which of course included all the input costs, plus some profit, and accepted net income in satisfaction of the rights that ¶ 5(e) granted Debtor. The Court cannot imagine how anyone negotiating a contract could realistically think the other party to the contract would

---

[55]The Court has been told by the BAP that it should not adopt an interpretation that would lead to absurdity. Reading this section to grant anyone 100% of the gross proceeds from farming, without deducting input costs, would be absurd. For example, admittedly for the 2007 year, which is the only year for which we have full cost information, Southwest Ag expended $14,210 to plant and harvest the crop on Tract 3, then sold the wheat for $17,560. It would be absurd for the parties to have mutually agreed that Rafter Seven could keep the gross income from this land, especially since the agreement also recognizes the lease interest that the tenant had in a prior year's crop. No one would ever farm this or any other land under those terms, and since the parties agree the highest and best use for this property is for farming, no person would ever buy this land if a third party had a perpetual right to any gross income generated thereon. Further, WNL received $7160 minus the $4,000 in taxes, or $3,160, but under Friesen's interpretation, he would be entitled to keep the $17,560 in gross income. If the parties were trying to equalize the division of the known property in existence at the time the agreement was made, $3,160 is grossly disproportionate to $17,560 (and the agreement referenced three tracts, not just one, so the potential for gross income off all three tracts was likely three times that much). It is clear that such a result was not the shared intent of both parties.

23

ever agree to a "gross income" provision. Friesen also testified he doesn't intend to make a claim—and doesn't believe he even has a claim—for anything other than the net profit.

Second, the sale of Tract 2 closed after the 2007 wheat crop was planted. Thus, if Debtor was really entitled to all the farm income off of Tract 2 as of the date of closing—as Friesen contends should now be the rule for Tract 3, it would be entitled to make a claim against the buyer for that crop. He has not done so, and at trial Friesen said he did not intend to do so because it was "a straight up deal."

Third, it seems clear that the paragraph regarding "farm income," being wedged between paragraphs dealing with facts known by the parties at the time of the negotiation—that WNL would get the Finney County money, but would have to pay the 2005 taxes with it, in exchange for Debtor getting the net income from the 2006 wheat crop, seems very consistent with a mutual agreement to divide up the money or income about which both parties were aware would need to be resolved in July 2006, when Debtor would supposedly have to come up with the $240,000 and title would be transferred to it. There is nothing about the agreement that would indicate the parties expected to be dealing with one another after July 15, 2006, or as soon thereafter as WNL could auction the properties. And because the agreement calls for WNL to receive absolutely no interest on the $240,000 settlement amount, WNL had every monetary incentive to sell the land as soon as possible.

The Court finds it is highly unlikely that the parties' shared intent was that future wheat crops, which would be planted nine or ten months after the agreement, and harvested 18 months after the agreement was negotiated, would inure to Debtor's benefit unless Debtor

had either paid for the land up front, or by making the high bid at the auction. Accordingly, the Court does not believe the 2007 (or later years') crops were on either parties' radar at the time this agreement was negotiated.

The Court finds that within the four corners of this contract, the most reasonable interpretation of ¶ 5(e) is that Debtor would receive the net income from the crop that was actually in the ground at the time the parties were negotiating the deal, that the property would be sold very soon after July 15, 2006 if Debtor could not pay $240,000 by the agreed date, and thus, there would not even be a future crop to discuss at the time of the negotiation. Since Debtor stipulates that it received the appropriate amount of money from the harvest of the crop that was in the ground at the time the agreement was made, it is thus entitled to no more income from any of the real estate, including Tract 3. Because it is not entitled to the income generated by Southwest Ag, with the permission of the owner, WNL, after that 2006 crop year, Koster's failure to turn over his 1/7th share of the 2007 profit does not constitute a violation of Debtor's stay rights.

Similarly, Debtor has admitted that WNL, as the absolute owner of the land, had no duty to plant a crop for Debtor's benefit, and could allow anyone on its own land. The Court further finds that WNL did not violate any stay rights by allowing Koster/Southwest Ag on the land. Parenthetically, since WNL did not receive a single dime from the 2007 wheat crop, Debtor could not have stated a cause of action for a stay violation against WNL even if it could have stated one against Koster. WNL converted no property right of Debtor, and thus violated no stay right.

25

Even without hearing any parol evidence from the parties who actually negotiated the contract, the Court thus finds in favor of WNL and Koster. This finding is not altered by, but is instead merely buttressed by, the abundant parol evidence that was offered by both parties about the formation of the contract and their respective understanding about the contents thereof. Admittedly, the general rule is that when a contract is complete and unambiguous and free from uncertainty, parol evidence of prior or contemporaneous agreements or understandings tending to vary the terms of the contract evidenced by the writing is inadmissible.[56] But the pertinent sentence is anything but free from uncertainty, or unambiguous, and therefore, the Court may admit parol evidence.

WNL's principal, Wayne Hansemeyer, testified his major goal in the negotiations was to obtain a binding agreement that Rafter Seven could actually perform by which all further business relationships between WNL and Debtor/Friesen would quickly and permanently cease. He stated, and Friesen agreed, that Friesen told him he fully intended to pay the amount necessary to become the owner of the Real Estate by July 15, 2006, and in fact, claimed he could obtain the money within 60 days of the agreement. So the outward manifestation of both parties was that the Settlement Agreement would be fully effectuated by July 15, 2006, or very soon thereafter.

Further, both Hansemeyer and Friesen admitted that ¶ 5(e) was intended to be the "quid pro quo" for ¶¶ 5(d) and (e), which provided that WNL would receive the approximate amount of $7,160 (minus $4,000 in 2005 taxes it agreed to pay). In other words, the parties

---

[56]*Quenzer v. Quenzer*, 225 Kan. 83 (1978).

intended to try to equalize their respective recovery of known assets. This would suggest that the parties intended that Debtor's entire "take" from ¶ 5(e) would likely be in the $3,100 range. At trial, Friesen said he hoped to do "a little bit better" than an exact "quid pro quo," which suggests to the Court that he did not then contemplate the theory he now espouses, which would likely have resulted in Debtor receiving considerably more than WNL was to receive (on all three tracts).

In addition, no purchaser in his or her right mind would ever buy any of this land at sale if Debtor could forever hold out its figurative hand to receive 100% of the gross (or even net) income ever generated from the land's production. Thus, the Court cannot find that it was the parties' mutual intent to negotiate for that result. Finally, Debtor relied heavily on one sentence of the summary that WNL's counsel gave to Judge Somers about the terms of the negotiated agreement, in trying to persuade this judge that the parties mutually intended for Debtor to obtain gross proceeds from Tract 3 until the sale closed. Counsel indicated that "[a]ny farm income generated basically from this day forth goes to the Debtor Rafter. And that, I think answers your question about landlord share and what happens to that for the balance of this year, or until we finish the deal." Rafter Seven says this reflects that WNL also understood that it would receive gross income until the sales of the land closed, because that is when the "deal" would be finished.

The Court does not find that counsel's summary of the agreement corroborates Rafter Seven's position. That summary, like the language itself, is capable of more than one interpretation. The far more persuasive evidence is contained within the four corners of the

27

agreement itself; its language was ultimately negotiated over the month following this oral summary of a settlement that the parties had just negotiated in principle. The agreement clearly favors the interpretation asserted by WNL. Debtor has not sustained its burden of demonstrating that there was any stay violation by WNL or Koster, and the Court finds there was no stay violation.

**B.** **Even if WNL or Koster violated the stay, Rafter Seven is not entitled to seek damages under 11 U.S.C. § 362(k).**

Although Debtor did not demonstrate that there was even a violation of its stay rights, even if there had been, Debtor is seeking sanctions pursuant to § 362(k),[57] and that section provides it no remedy. Subsection (k) provides:

> Except as provided in paragraph (2), an <u>individual</u> injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages (emphasis added).

Both WNL and Koster have objected to Debtor's attempt to obtain damages under § 362(k) on the basis that it is not "an individual," as the statute plainly requires on its face. There is a split of authority on this issue, with no binding authority in the Tenth Circuit.[58] Some courts have strictly read the language contained in § 362(k), holding that only debtors who are individuals—i.e., natural persons as opposed to corporations, partnerships or trustees, can

---

[57]Prior to the 2005 amendments to the Bankruptcy Code made by BAPCPA, the language now contained in 11 U.S.C. § 362(k) was found in § 362(h). The language was not amended by BAPCPA, but was simply renumbered with a different subsection. For simplicity, the Court will cite to § 362(k) in this opinion, despite the fact that § 362(h)(2004) is the code section that is actually applicable here.

[58]Both Judge Nugent, and Judge Robinson when she was a Bankruptcy Judge, have suggested Chapter 7 trustees may well be considered "individuals" under § 362(k) in *In re Spoonemore*, 370 B.R. 833 (Bankr. D. Kan. 2007) and *Fisher v. St. Joseph Medical Center, Inc. (In re Fisher)*, 194 B.R. 525 (Bankr. D. Kan. 1996), aff'd 1996 WL 695401, slip op. (D. Kan. Nov. 27, 1996).

seek relief under § 362(k).[59]   Other courts have interpreted the term "individual" more

expansively, applying § 362(k) to cases involving corporate debtors such as Rafter Seven.[60]

> *Collier on Bankruptcy* succinctly analyzes this issue, as follows:

> Although the automatic stay is of critical importance in bankruptcy cases, the better approach is to recognize that section 362(k) provides a remedy only for natural persons.  The provision was enacted in 1984 as part of a package of consumer amendments intended to deal with individual bankruptcy.  If Congress had intended to provide a damage remedy for all debtors, it could easily have chosen a word other than "individual" to denominate the beneficiaries of the remedy.  In fact, although the standards and procedures for contempt may be slightly more demanding, courts have had little difficulty dealing with and punishing stay violations even without the availability of section 362(k).  There is little reason to adopt a tortured reading of the statute in order to provide corporate or partnership debtors or trustees with a remedy for stay violations.[61]

The Court finds the discussion by *Collier* to be most persuasive.

Section 362(k) clearly refers only to "an individual" when indicating who may seek

relief under that section.  When interpreting statutes, courts "'must presume that [the]

legislature says in a statute what it means and means in a statute what it says there.'"[62]  The

statute refers to an "individual," not a corporation, partnership or any other type of entity.

This is significant because Congress, in its own definitional section contained in the

---

[59]*See, e.g. In re Pace*, 67 F.3d 187 (9th Cir. 1995) and *Maritime Asbestosis Legal Clinic v. LTV Steel Co, Inc. (In re Chateaugay Corp.)*, 920 F.2d 183 (2nd Cir. 1990).

[60]*See, e.g. Cuffee v. Atlantic Bus. & Cmty. Dev. Corp. (In re Atlantic Bus. & Cmty. Corp.)*, 901 F.2d 325 (3rd Cir. 1990) and *Budget Serv. Co. v. Better Homes of Virginia, Inc.*, 804 F.2d 289 (4th Cir. 1986).

[61]3 *Collier on Bankruptcy* ¶ 362.11[3] (Lawrence P. King ed., 15th ed. Rev. 2005) (citations omitted).

[62]*Dodd v. United States*, 545 U.S. 353, 357 (2005) (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249 (1992)).

Bankruptcy Code, § 101, specifically distinguished between individuals and partnerships when it defined the term "person" in subsection (41).

This interpretation is further bolstered by the fact that this statutory provision was added as part of a package of consumer amendments to the Code, which indicates that limiting the relief to individual debtors was not an oversight, but was instead consistent with prevailing Congressional intent at the time the language was added. Had Congress intended to make the provisions of § 362(k) available to other types of debtors, it could very easily have chosen to use the defined term "person," which term includes individuals, partnership as well as corporations.[63]

It is not for this Court to question the reasoning behind Congress' decision to limit the protections of § 362(k) to individuals, nor is it this Court's role to rewrite statutes to conform with its own sense of fairness or good policy.[64] Instead, it is the Court's duty to interpret the will of Congress, and once that will is made express by the terms of a statute, to enforce the statute as written.[65] The Court finds the statute is clear, and that Debtor, as a partnership entity, would not have been entitled to relief under § 362(k) even if it had persuaded the Court that it was entitled to the 2007 crop proceeds.

---

[63]Section 101(41).

[64]*Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.*, 128 S. Ct. 2326 (2008) (dismissing Piccadilly's argument that reading statute to allow pre-confirmation transfers to be taxed while exempting others moments later would amount to an "absurd" policy, by reiterating that " 'it is not for us to substitute our view of ... policy for the legislation which has been passed by Congress.' "). (citations omitted)

[65]*See Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 13-14 (2000) ("Achieving a better policy outcome—if what petitioner urges is that—is a task for Congress, not the courts") and *United States v. McIntosh,* 236 F.3d 968, 972 (8th Cir. 2001) (holding that irrespective of how much we dislike a particular outcome, or how we see the equities of the case, we are not at liberty to rewrite the statute).

Case 05-40483   Doc# 430   Filed 07/15/08   Page 30 of 39

**B.     Rafter Seven is also not entitled to relief under § 105.**

Debtor contends that if it demonstrates that WNL and/or Koster took unauthorized action against property of the estate, that this Court can nevertheless order payment of sanctions under § 105, even if it is not entitled to damages under § 362(k) as a result of its partnership status.  Again, even if the Court had preliminarily found that WNL and/or Koster had taken unauthorized action against estate property, the Court would not use its equitable powers under § 105 to grant Debtor relief under all those material facts about which there is no genuine issue.

Section 105(a) provides, in part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  "The Tenth Circuit has recognized that Section 105(a) is intended to empower bankruptcy courts with the inherent powers imbued in the federal district court to sanction conduct abusive of judicial process."[66]  Courts have thus interpreted § 105(a) to give broad equitable powers to bankruptcy judges in dealing with matters that arise under the Bankruptcy Code, and have specifically held that § 105(a) can be used to provide damages in the event of a violation of the automatic stay.[67]  This Court finds that § 105(a) provides it the power to punish a

---

[66]*In re Vitt*, 250 B.R. 711, 723 (Bankr. D. Colo. 2000) (citing *In re Courtesy Inns, Ltd., Inc.*, 40 F.3d 1084, 1089 (10th Cir. 1994) and *In re Skinner*, 917 F.2d 444, 447 (10th Cir. 1990)).

[67]*See In re Skinner*, 917 F.2d at 447 (10th Cir. 1990) (affirming an award of sanctions pursuant to § 105(a) for a violation of the automatic stay).  *See also In re Cascade Roads, Inc.*, 34 F.3d 756 (9th Cir. 1994) (indicating that courts have authority to issue sanctions for violation of the automatic stay pursuant to § 105(a) even when such damages are not available under § 362(k)).

31

violation of the stay committed against a partnership debtor, if equity so mandates, notwithstanding Congressional omission of such a remedy under § 362.

But unlike § 362(k), the Court's powers under § 105(a) are discretionary.[68] In other words, the Court is not required to award sanctions under § 105(a), even if it determines there has been a violation of the automatic stay. This is because "[a]s courts of equity, bankruptcy courts must apply equitable principles and 'direct to be done that which ought to be done.'"[69] Given the facts about which there is no genuine issue of dispute regarding Debtor's actions, and omissions, surrounding the crop at issue herein, the Court would decline to use its § 105 equitable powers to create a remedy for the actions of which Debtor complains. Debtor has not done equity, and deserves none from this Court concerning the 2007 wheat crop.

A brief review of the relevant facts of this case illustrates why the Court would decline to exercise its equitable powers in Debtor's favor:

1. The sale of Tract 3 took place on October 31, 2006, following approval by the Bankruptcy Court on October 25, 2006.

2. Koster was the high bidder at the auction of Tract 3. Although Friesen knew Koster intended to plant a crop and to try to improve the condition of the land by engaging in intensive weed control efforts, because Koster told him so on the date of the sale, and that WNL had agreed to Koster's request, Friesen nor anyone else on behalf of Debtor told Koster or anyone else that Rafter Seven claimed any interest in all future income derived from that tract.

3. WNL authorized Koster to plant a wheat crop on Tract 3 prior to the date the sale was supposed to close, recognizing that it would be beneficial to get some

---

[68]*In re Pace*, 67 F.3d at 193 (stating "[i] is equally clear that, while an award of damages under [§ 362(k)] is mandatory, an award of damages under section 105(a) is discretionary.").

[69]*Braniff, Inc. v. GPA Group PLC (In re Braniff, Inc.)*, 118 B.R. 819, 841 (Bankr. M. D. Fla.1989) (quoting *In re Bronx-Westchester Mack Corp.*, 4 B.R. 730, 734 (Bankr. S.D.N.Y. 1980)).

32

crop planted that year to help control the extensive weed problems on that tract of land.

4.     Southwest Ag planted wheat on Tract 3 on or about November 3, 2006. Friesen knew the crop was being planted at the very time it was being planted, but told no one that Rafter Seven would claim an interest in that crop.

5.     Friesen was simultaneously negotiating with Koster to trade Tract 3 to him/Rafter Seven in exchange for other land. Friesen sent a letter to Koster dated November 1, 2006 acknowledging that Koster was in the process of, or had planted, Tract 3 to wheat, but made no effort to notify Koster that he would try to take 100% of the gross proceeds from the land if Koster failed to accept his offer.

6.     Southwest Ag provided 100% of the labor and expenses used to plant the wheat crop at the end of 2006. Debtor contributed nothing. At about the same time as Southwest Ag was planting the wheat, Debtor was trying to negotiate a trade with Koster, but elected not to mention his claim because he thought it might impair getting the deal. During that negotiation, he recognized that farmers don't work for free during --recognizing that Koster would need to be repaid his expenses—but now seeks to receive gross income.

7.     On November 22, 2006, very shortly after the wheat crop had been planted, Debtor filed a motion for reconsideration of the Court's ruling about the sale of Tract 3, which was denied on December 22, 2006. Rafter Seven made no attempt to inform the Court, or these parties, about this claim at that time.

8.     On December 27, 2006, Rafter Seven appealed the Court's ruling to the BAP. Debtor made no attempt to disclose this claimed interest at any point during this appeal.

9.     Although Rafter Seven was well aware that the wheat was being harvested, its principal made no effort to expend Rafter Seven's own money to harvest the wheat, and further made no demand for a return of the wheat before Southwest Ag sold it. He also did not suggest that the wheat should be stored, instead of sold, at any particular time in order to obtain a better price.

10.     On September 12, 2007, the Bankruptcy Appellate Panel ruled that WNL should not have sold Tract 3 on the same day as Tract 2, but had to wait at least one day between the sale of those tracts. This order served to effectively void the sale between Koster and WNL for Tract 3. Friesen then elected to

33

wait almost six weeks after that decision, not coincidentally <u>after</u> Southwest Ag had expended additional sums to plant a 2008 crop on the tract, before authorizing counsel to finally make his first demand for damages—on October 21, 2007, and just hours before a hearing scheduled the next morning. This was the very first time that Debtor asserted its claim that both WNL and Koster had violated the automatic stay by converting estate property, namely the 2007 wheat crop from Tract 3.

11.    Prior to this date, Debtor elected to make no demand on WNL or Koster for the 2007 wheat crop, nor had it ever indicated an intent to assert a claim in that crop or the income derived from its sale.

Under all these facts, equity most certainly does not favor Rafter Seven. At least in regard to planting and harvesting the 2007 wheat crop, Koster and WNL have at all times acted in good faith and proceeded in accordance with the rulings of the Bankruptcy Court. WNL sold Tract 3 after the sale was expressly sanctioned by Judge Somers, and not before, even though it had bargained to be paid its agreed $240,000 months earlier pursuant to the Settlement Agreement.

The agreement specifically stated that "as of the date of their stipulation and agreement, January 10, 2006, WNL is and shall be the absolute owner of all legal and equitable interest in and to" the pertinent tract.[70] Even after Debtor filed its appeal of the sale timing decision, it never came to this Court, or to the BAP, seeking to evict Koster (or more appropriately, Southwest Ag) from the land, nor did it ever make a timely demand for the alleged farm income, so that Koster could evaluate his alleged risks of continuing on the course of planting and harvesting a crop on Tract 3, and so that WNL could evaluate its risks of allowing Koster and/or Southwest Ag to continue farming the land.

---

[70]Doc. 177, ¶5(a).

34

In fact, Rafter Seven did nothing to give Koster or WNL any reason to believe that Rafter Seven would come in, months after the crop had been planted and harvested, and assert a claim to the proceeds from that crop. Instead, Rafter Seven laid in wait, acting through its 98% owner Michael Friesen. Friesen knew at all times that there were ongoing farming operations on Tract 3. He knew at all times, from his farming experience, that considerable time and money was being expended to control for weeds and plant a crop. He had known Koster for 45-50 years, but never went to him to ask about this issue, or assert a claim. He kept this secret to himself, apparently hoping to swoop in at the most opportune time (after the 2007 crop yielded a net profit, despite all odds, and the 2008 crop had been put in the ground), to assert a claim to the proceeds of the inputs and toil invested by others to produce a crop and try to better the condition of land that had apparently been neglected while Rafter Seven had control of it.

When asked in his deposition about this seemingly callous plan that would cause Koster to spend money to harvest a crop that Rafter Seven at some point in time decided to claim as its own, Friesen testified "That was his [Koster's] problem."[71] It was incumbent upon Debtor, at least if it wanted to obtain this Court's equity, to have notified Koster that it intended to state a claim on the 2007 wheat crop so that Koster could make an informed decision whether to have Southwest Ag proceed with the time and expense of planting, then harvesting, that crop. Similarly, it was incumbent on Debtor, if it wanted the Court to use

---

[71]Friesen Dep page 53. Friesen also admitted that any person who would spend money to harvest a crop when he would not only not get reimbursed for expenses, but would also reap no profit, "would be foolish." Page 122. Mike Friesen's calculated decision not to disclose his intent to Duane Koster is the decision of a man who is not acting in good faith. And as Rafter Seven's general partner, his actions and failures to act are attributed to Rafter Seven.

35

its equitable powers on its behalf, to have informed WNL of this theory so that WNL could evaluate its risks of allowing Koster or Southwest Ag to remain on the land.[72]

Conversely, Koster and WNL acted in good faith in regard to the 2007 wheat crop. They acted at all times in accordance with every court decision that had been issued at the time the crop was planted and harvested, notwithstanding that one decision was ultimately reversed on appeal.[73] They had absolutely no indication that Debtor intended to make a claim against the income ultimately received from the 2007 wheat crop, if any, until after the crop had already been harvested and sold. And this Court further finds that the Settlement Agreement, when read as a whole, would not have reasonably put either party on notice that such a claim was remotely reasonable.

Debtor, on the other hand, apparently knew from the beginning—according to Friesen now, or at the latest by November 2006, that it intended to make such a claim against this crop and WNL and Koster. Notwithstanding that Friesen was well acquainted with one of the partners of the partnership that was investing time and money into the farming operation, he opted to sit silently by in the hopes of playing the classic game of "gotcha." He allowed the crop to be planted, cared for, harvested and sold, without notice of his claim to anyone,

---

[72]See In re Smith Corset Shops, Inc., 696 F.2d 971, 977 (1st Cir. BAP 1982) (holding a debtor may not remain "stealthily silent" when it knows estate assets are being moved, and then successfully sue for the alleged conversion of those same assets).

[73]Out of the four judges that considered the interpretation of the sale timing issue, two (Judge Somers and the dissenting BAP judge) found that the sales of Tracts 2 and 3 could be held consecutively on the same day, and two held the sales had to occur at least one day apart. Accordingly, WNL and Koster acted in good faith at all times, which is not something the Court can say about Friesen. Again, although there are numerous examples that Friesen has not acted in good faith towards Koster, his decision to divert to his children's trusts the proceeds received from the 2006 wheat crop, which were received as a result of the terms of the Settlement Agreement wherein those trusts expressly disclaimed any interest in the property, instead of properly depositing the funds in Debtor's Chapter 12 account, and reporting it to the Chapter 12 Trustee, is especially unsettling.

Case 05-40483   Doc# 430   Filed 07/15/08   Page 36 of 39

hoping to reap a complete windfall based upon an alleged stay violation.[74]  Debtor's actions are not of the type upon which successful equitable claims are made.

Debtor could have easily prevented the very damages it contends it has incurred in this case by simply being honest and up front from the beginning with Koster and WNL.  The Court declines to reward Debtor's actions—and purposeful decisions not to act—by invoking its equitable powers under § 105(a) in Debtor's favor.  Therefore, even if the Court were to find a violation of the automatic stay, the Court would not grant relief to Rafter Seven under § 105(a) given these facts, about which there is no genuine issue.

## III.    CONCLUSION

In light of the undisputed facts in the record, coupled with the testimony of the principals, the Court finds preposterous Rafter Seven's allegation that Koster's actions constitute " no more than theft ... aided and abetted by WNL."[75]  Koster is entitled to summary judgment on Debtor's Motion for Actual Damages, Attorney Fees, Costs and Punitive Damages Against Respondents for Violation of the Automatic Stay.  The Court also finds that because Rafter Seven never claims—and it could not—that WNL owed a duty to it to plant a crop on Tract 3, WNL did nothing wrong—and certainly violated no stay right of Debtor—by agreeing to allow a third party to come upon what even Rafter Seven admits

---

[74]WNL and Koster also allege that because of Southwest Ag's farm practices on Tract 3 in 2007-2008, the land is now more valuable than it was on October 31, 2006 when it was first auctioned.  The significant weed infestation is now under control, and the land is now productive.  When Tract 3 is again sold, therefore, it may well bring a better price than it did in 2006, which will ironically inure to Rafter Seven's benefit (and thus to Friesen's benefit), since Rafter Seven will receive any amounts in excess of the amount needed to satisfy the $240,000 agreed price.  *See* ¶ 5(c)(4). Perhaps this is yet another reason why Friesen elected to sit silently by, allowing Koster to improve the value of the land.

[75]Debtor's brief, Doc. 407 at page 13.

Case 05-40483    Doc# 430    Filed 07/15/08    Page 37 of 39

is WNL's land to plant a crop.  WNL received no income from this wheat crop, and the Court thus grants summary judgment to WNL on its prayer to deny Rafter Seven's claim against it.

**IT IS, THEREFORE, BY THE COURT ORDERED** that Debtor Rafter Seven Ranches LP,'s Motion for Summary Judgment[76] is denied.

**IT IS FURTHER ORDERED** that Creditor WNL Investments, LLC's Motion for Summary Judgment[77] is granted.  Although the Court had, in its Pretrial Order, deferred Rafter Seven's request for punitive damages against WNL, based on a determination whether actual damages were sustained,[78] the request for punitive damages is also denied since Debtor could not even substantiate a claim for actual damages.

**IT IS FURTHER ORDERED** that Duane Koster's Motion for Summary Judgment[79] is granted.  Although the Court had, in its Pretrial Order, deferred Rafter Seven's request for punitive damages against Koster, based on a determination whether actual damages were sustained,[80] the request for punitive damages is also denied since there is no basis for even actual damages..

**IT IS FURTHER ORDERED** that the foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy

---

[76]Doc. 390.

[77]Doc. 392.

[78]Doc. 388, ¶6.

[79]Doc. 394.

[80]Doc. 388, ¶6.

Procedure, which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. A judgment based upon this ruling will be entered on a separate document filed in this case, as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED**.

###

Case 05-40483    Doc# 430    Filed 07/15/08    Page 39 of 39